Good morning, all. Our first case for argument this morning is Conway v. General Electric. Mr. Anaya? Yes, Your Honor. My name is Bill Anaya. I'm here representing the Plaintiff Appellant. You may proceed. May it please the Court, Counsel. The Plaintiff Appellant in this particular case filed an endangerment case seeking an abatement of an imminent and substantial endangerment under Section 42 U.S.C. 6972 A.1.B. A.1.B is the so-called endangerment case that this Court found earlier and analyzed in the Adkins decision. In December 2015, the District Court found that Plaintiff's claim was not precluded by the state court action and found that the GE's contamination had created an imminent and substantial endangerment. The District Court also held GE liable for the imminent and substantial endangerment and found that the so-called natural attenuation being employed by GE was not working. The simple question before this Court on appeal is whether the District Court ever ordered GE to abate the imminent and substantial endangerment caused by GE in contaminating 500 million gallons of previously clean drinking water available to the people of Whiteside County. It's in a natural resource aquifer and it is completely unusable and poisoned today. The District Court held or found that the state action and the RCRA action that we filed were parallel actions as described by the District Court and both NGE. Because RCRA involves an abatement and because the state court action does not, they can't be parallel cases under the Court's analysis. The Illinois EPA did not even have authority under its enabling statute at the time to be able to authorize any kind of affirmative action. In 2004 when the complaint was filed, the authority that the Illinois EPA had at the time was in 42E which at that time only allowed prohibitory objections. Thou shalt not commit any more water pollution. It had no authority to order any type of affirmative mandatory action. To suggest that the cases are parallel is to ignore the RCRA mandate that Congress employed which is to mandate after the finding of an imminent and substantial endangerment an abatement order. Now there's a lot of distinctions and this court in Atkins did an excellent job of analyzing the A1A and the A1B cases. Mr. Anaya, could you tell us what the current status of the Illinois EPA action is? And I thought there was a remedial plan in place. There is no remedial plan in place. It was only institutional controls that were approved in the consent order, Your Honor. There is nothing. Monitoring? Nothing. Okay. And so is that case done at this point? Is it subject to long term court oversight or what? It's not subject to any over term oversight. I suppose it's conceivable that, no, the short answer to that is I think the Illinois EPA has closed its file. It got its institutional controls. It negotiated them in the consent order. GE complied or is in the process of complying. They still don't have one of the institutional controls on the county property. So a significant portion of the property is still yet unprotected even under the consent order. No, the consent order is not. It's completed as far as the state of Illinois is concerned. And is there a public source of information that we can count on for that? It's an interesting question. We deal with it all the time. It's an administrative matter. We're not allowed to intervene. I can't access those files. The fact of the matter is the consent order has been complied with and no one has objected to it. Illinois EPA is satisfied with EPA, with General Electric's reports. It still remains poisoned today. 500 million gallons of a drinking water aquifer remain contaminated today. And nothing is being done except institutional controls on part of it. And institutional controls are only deed restrictions and city ordinances. It doesn't mean that I can't come into contact with it or you can't come into contact with it. It doesn't mean anything. I can legitimately build a swimming pool on the golf course property because it's in the county, fill it with groundwater from that activity, and have all the kids in Whiteside County swim in it. Right now that's lawful. There is no prohibitory activity that allows that, or that doesn't allow that. The north well on the golf course property still has 1,000 times, 1,000 times the maximum contaminant level of contamination as established by the United States Environmental Protection Agency. That water is so unpotable, undrinkable, you can't wash your car in it, you couldn't fill your swimming pool with it. That still exists today. That's the status as far as I'm concerned with the state action. Do you agree that the last spill was in 1994? The last spill was in 1994 is what we're told, but it doesn't mean that it stopped migrating. That material was in such a large volume, and the GE plant is on a hill, and the Rock Creek is down like most riverbeds are. That material is still migrating across and into the golf course property and into the city of Morrison and west. It's even actually going north, but because the downgradient nature of that land, Illinois EPA was concerned only with the downgradient feature because Rock Creek is at the southern boundary of that particular property. And if this huge slug of contamination were falling south, were going south, they were concerned that it was impacting Rock Creek. They did a very limited investigation to only find out within their authority, within EPA's authority, that the material was contaminated. They didn't have authority in 2004. And what I would point this court out to is the People v. Einorder case, which is an Illinois Supreme Court case that found, and I think we briefed because it didn't occur to me until I understood, preparing for this argument today, that that issue was EPA's authority exactly. But in 2004, when this complaint was filed, the Illinois General Assembly only provided in their enabling statute to Illinois EPA that they could stop, cease and desist further acts of prohibition, prohibiting water pollution. They couldn't do anything. They couldn't address. The People v. Einorder case, I don't have that where I can get my hands on it real quickly. It's identified at 28 Northeast 3rd, 758, 390, Illinois Decisions 105. And in that case, the Illinois Supreme Court said that the Section 42E authority that was later amended in 2008 did not, you couldn't apply it retroactively. So all the authority that Illinois EPA had at the time was to restrict any further water pollution. So therefore, they investigated to see that the water was stagnant, and that's what the investigation was. And that was the issue that we presented at the trial. Well, can I tell you what's bothering me about this? Sure. The district court cited the old principle, first do no harm, and obviously was concerned about the prospect that an injunction to, for example, even do testing by drilling into the shale underneath the polluted area could spread contamination further. As near as I can tell from the record, Judge Johnston was asking you all repeatedly, what do you want? What do you need? You told him more investigation in a variety of ways. He disagreed with you on that. And I don't see you challenging those findings on appeal. What I don't see in the district court record is an answer to the judge's question, what cleanup order do you want? Where do I find that? It's an excellent question. It's in the request for the injunction, the memorandum of injunction. We put together a 13-point order. They're all about further investigation. No, they're not. The first investigation is certainly a large part of it, because you can't design a remedy unless you know where the material is at. The second part of that order was interim hot spot cleanup. We knew of some things in that investigation. We know, for example, that the north well on the golf course has 1,000 times the MCL, and that somebody better, you know, that's an easy one to stick a well in and start pulling that material out. Your expert, Dr. Banizak, as I understand it in his testimony, did not endorse the pump and clean remedy. That's GE's interpretation. But if you look at the rest of what Dr. Banizak said, he said, the reason why I can't give you that is because they haven't done a full investigation. We don't know what's going under the shale. We don't know what's going north. We don't know what's going east and west. So you're back to the investigation point. And I'm beginning to understand Judge Johnston's frustration. And let me explain it to you again then. The proposed order had the interim hot spot removal. The proposed order had get a further investigation of this particular property. The proposed order had abate the rest of it. Once you've decided, the courts that we've cited in our briefs recognize that there's ambiguity at the time of an initial abatement order and that sometimes iterative activities are going to have to happen. But if I sweep the floor with my eyes closed, I might miss something. I need to open my eyes to sweep the floor so that I can get all of the material. GE was only doing an investigation, and God bless them, pursuant to what Illinois EPA wanted to know. And all that Illinois EPA wanted to know was, was it contained? They didn't have authority to mandate anything else. Is it going to further impact waters of the state of Illinois? We might disagree with them. I'm not going to argue with them. I think they're a wonderful agency. I think they did a wonderful job for what their limited authority was, but their investigation only confirmed to their satisfaction that the material wasn't moving any further. Now, we disagree. We found material south of Rock Creek, and we don't think that the investigation was done very well. We know for certain that they didn't go below the shale. We know for certain they didn't go north. We know for certain they didn't go east and west. And you cannot create an abatement order. Okay, so you are challenging then the district court's findings about whether you've shown a need for further investigation. I think we showed a need for further investigation. I also think we had interim activities of hotspot removal, and we had the ultimate question of abate the property identified in that proposed order. Okay, but is it enough to just say fix it? Yes. Is that an adequate injunction? Look at the APEX decision approved by this court. The APEX decision was decided in the Southern District of Illinois. It's an endangerment case under 7003, a government case, but the same criterion are applicable in our case. That's exactly what the Seventh Circuit approved of the Southern District's order, clean it up. Now, they had parts of an investigation, too. They wanted further investigation. The cases we've cited in the briefs identify that additional investigation is a perfectly appropriate injunctive activity when you're designing an abatement order. For the district court to conclude that Illinois EPA's order was adequate was to say that the Illinois EPA adequacy of a limited investigation applies to RCRA and it simply does not. I understood his thinking a little differently. I understood him to have said that, yes, we've got a problem here, but plaintiffs haven't shown me a path that will actually, something I can order that will actually improve the state of the world. And I understand that, Judge, and I'll say to you again, there's 13 activities identified in a proposed order that we gave Magistrate Judge Johnson for his review. It's attached to Conrad Banaszak's affidavit where he explains the need for it. We had a proposed order that was in it. Now, that particular hearing that the judge is talking about, he gave us two hours to put on a witness, and they got two hours, we got a couple of hours worth of cross-examination. He promised us questions that we were expecting. He promised them twice we were going to get questions that we were going to directly answer at that particular hearing, but that doesn't mean that we changed or disavowed or whatever GE said we did, all of the 13 things that want to be done. We don't think the hearing was even necessary. Once he finds an imminent and substantial endangerment, RCRA and Congress only provide for an abatement in an A1B case. And an abatement is to lessen the degree or intensity of the contamination. And institutional control simply leaves it there. And institutional control is a deed restriction and an ordinance. Again, they don't even have those yet. Is it correct that the district court heard conflicting evidence about the potential effectiveness of the different approaches that you and GE were proposing or discussing? I didn't see an endorsement of any particular approach. I don't know that he heard conflicting evidence necessarily, Judge. I think it's a good question. I think he heard conflicting conclusions. Our guys said you better do some more investigation because you've got to do a proper abatement. Their guy said we did all the Illinois EPA required us to do. That may have conflicted Magistrate Judge Johnson, but it's not analyzed properly. You set aside the state action. Did you do any investigation to contradict GE's findings? Did we do any investigation, my goodness. To contradict GE's findings. To contradict GE's findings. We pointed out that GE's findings were incorrect. Well, in what way did you do that? A thousand parts per million above the MC, a thousand times the MCL on our property. We pointed out that there was no definition of the contamination north. There was no definition of the contamination east or west. It was an improper definition of contamination that had crossed Rock Creek and was now migrating south. And how did that come about, your reaching those conclusions? What actual investigation did you conduct? We reviewed all of the material that GE provided. So you just reached conclusions contrary to what they provided? Well, again, we were looking at it from the perspective of RCRA. They were looking at it from the perspective of the Illinois state action. The Illinois state action was necessarily limited. They never analyzed it under the terms of RCRA. We analyzed it under the terms of RCRA. You need an abatement. Institutional controls don't work. They said, ah, but Illinois EPA says it's okay. Those are chips passing in the night. I just want to remind you about the time. I don't want to cut you off, but you're into rebuttal. I will stop now and we'll do rebuttal. Thank you, Judge. All right, thank you, Mr. Osterlin. Thank you. May it please the Court, Tony Osterlin on behalf of General Electric. You've heard this morning about how there's major contamination and there were questions about abatement, and the plaintiffs had said that nothing is being done. Respectfully, that isn't true. At the direction of the Illinois EPA and pursuant to a state court consent order, GE has been abating that contamination for years. It investigated the contamination. It eliminated the source material. It determined that the contamination was contained, and it implemented institutional controls to ensure that there was no threat to the public and that natural attenuation could occur. For the regulatory bodies charged with enforcing our nation's environmental laws, that is abatement, and it remains under the evaluation and supervision of the IEPA. A question was asked whether the consent order is finished. It is not yet finished. The remedial action plan that GE submitted was approved. Institutional controls are still being implemented at this time, and GE is still under the oversight of IEPA until those are done. When is that going to be? We can't answer that question. Those are in the process of Decades? No, I don't believe that's the case at all. The institutional controls are largely city ordinances, prohibiting access to those waters. How long will they need to be in place? That is not part of the record, and we do not know that answer. Isn't it fairly clear it would be at least decades? I think it would certainly be years, yes. I just can't tell you how long it will be. And is monitoring part of the consent decree? Monitoring is not part of the consent decree. I should say mandatory monitoring is not part of the consent order. GE can still do it. GE can look and examine, but it is not subject to required reporting monitoring. Now, with relief having been granted by the state court, the district court did the only reasonable thing, and that's already come up this morning. It specifically asked the plaintiffs to establish that they're entitled to relief beyond that was afforded by the state court action. And what did they do? They asked the district court to order more investigation. They did not ask for more physical cleanup. The district court, though, found that plaintiffs failed to prove that more investigation was necessary. Now, on appeal, this court pointed out. Paragraph 4 of their order, though, does say implement an immediate interim plan to remove hot spots, right, at Conway's property. Yes. In their proposed order, which, of course, is in evidence, they did propose 13 things that they asked the court to do. Nearly a full 10 of those were investigation. I'm aware of that, right. They had to do those investigations, the identification of hot spots and what was there. I'm asking you about the parts that aren't about investigation. Were there some? Yes, there were some requests for that in their proposed order. But at the time they had to present that to the judge, they chose not to. That wasn't a topic that came up by them. They didn't propose it. And their expert, and I'll get to this a little later, but when asked if he could propose a remedy, their expert said no, he couldn't do it. So they did not, when they had the opportunity, propose what could be done. And this court asked what was different, or I should say, well, I'll back up just one second. The plaintiffs tried to argue that a finding of record liability mandates that an injunction be entered, and that is just not the case. Now, this court has held in U.S. v. Marcotte, when you have a statutory question of interpretation, you look first at the statute. Record doesn't have any language saying that an injunction has to issue. It doesn't say if you find liability, an injunction must issue. It says the district court shall have jurisdiction to restrain any person or to order such person to take other action as may be necessary. So as may be necessary. In other words, is it necessary or not. Okay, we've got a finding. Counsel, we have a finding of substantial and imminent danger to human health, right? We do. That seems to go a pretty long way, at least towards irreparable harm, that could support an injunction, wouldn't you say? Well, that was up for the district court to decide. And the way that our environmental laws are enforced, they're risk-based corrective action programs. Here, that risk was eliminated. We identified the contaminants. They are contained in one location, and the public is prohibited from access to them. I've got to say, as a solution, that seems like one of the least satisfactory ones around. Why should we accept that as sufficient in this case? Well, the district court, I think, clearly followed this court's guidance in Adkins. And when it brought in the Illinois EPA to advise and let it give its opinions on this case, here's what the EPA said. The question we ask ourselves is, what injunctive relief would the court order? We submit the court would order GE to undertake the same side investigation, monitoring and payment of costs, as well as an order barring further endangerment, which no doubt would include some type of remedial effort, all of which the state posits is currently being done. And contrary to what was presented to you earlier, the Apex case from this court, it doesn't say that the cleanup can evolve, and Apex was widely different from this case. There we looked at whether an injunction that was already issued was impermissibly vague. And the court determined that it wasn't. But there were two major differences. The order was that there had to be a vapor system, and it would be subject to EPA oversight. The U.S. was the plaintiff in that case. The regulatory body was the plaintiff in that case conducting the oversight. Here, who would conduct that oversight? Is it plaintiff's counsel? Is it the court? It's not the EPA. So there's whatever injunction that they would have asked for that they failed to ask for in a cleanup effort, there wasn't the regulatory body to oversee it. Now, the Fifth Circuit very plainly rejected plaintiff's argument in U.S. v. Marine Shale Processors when it held, quote, nothing in RCRA restricts the court's jurisdiction in equity. And the First Circuit in Maine People's Alliance v. Mallincott even more plainly rejected it when it held that, quote, a district court is not commanded to issue an injunction after a finding of reparate liability. So what do we make of Judge Johnston's finding at the end of his opinion that plaintiffs failed to show irreparable harm? It seems to me difficult to reconcile with his finding of liability. Well, I think they failed to show harm that wasn't already being remedied. I think that's the answer to that question. He asked them what they would do beyond. I'll find this for you. Well, that was it. He asked, there were very pointed questions, both on direct and by the judge, if they would recommend particular remedies. And the answer was no, we couldn't. We'd have to have more investigation. I would also point out that the United States Supreme Court has said that RCRA is not principally designed to effectuate the cleanup of toxic waste. Its primary purpose is to minimize the present and future threat to human health and the environment, and that's Medgar versus KFC Western, 516 U.S. 479. So minimize the threat to human health and the environment. We already have an existing consent order that's doing just that. So how long does natural attenuation take? I looked through the record for that. There's no answer to that. It's not there. I seem to recall one of the general principles in environmental science being that nothing ever goes away. Well, we do know that natural attenuation is occurring because they took samples, which showed a breakdown of the chemicals was occurring. There were new, I guess, chemicals that weren't there before, so it was happening. But, again, I don't know the answer to that. Do we feel better about the byproducts?  We feel better knowing that the contaminants are contained and no one will have access to them. I think Judge Johnston correctly pointed out, and I think Your Honor may have asked this question this morning, but he was concerned with doing more harm, and certainly the plaintiffs admitted they did no investigation. They said they did an investigation, but they didn't conduct any tests. They didn't do anything on their own other than basically look at what GE did. And the GE expert, the Illinois EPA expert, said, for example, some of the testing that they wanted, drilling through the bedrock, had the potential to increase the contaminants and basically break the containment that was in place. And he made that as a factual finding. They've not challenged that on appeal. I'm sure it's there, but what's the total acreage or size of the contaminated area? I do not know that. Does anybody know it? I'm not sure if that's in the record. I certainly reviewed it. I don't know what the acreage for this site is. I can't find it off the top of my head, but it's there, and it was the foundation for the 500 million gallon estimate. Well, it was basically a length with height, I think, but I don't know what it is. How large is it going? How large is it not appropriate simply to remand this for an order of so-called pump and treat? Well, the plaintiff's own expert has testified that he is unable to recommend pump and treat at this time, and certainly we wouldn't have the court impose something that even the plaintiff's expert didn't request. On direct, this question, plaintiff's expert was asked on direct whether he had enough information to recommend particular remedies. Question, do you think there is enough information at this stage to recommend pump and treat? Answer, no. And as the court pointed out, the plaintiffs did not challenge the court's factual finding that they failed to prove that more investigation was necessary. The court didn't have its own expert, did it? It did not, but I think that's why it followed this court's guidance in Atkins to try to bring in the Illinois EPA. Now, similarly, when the district court asked the plaintiff's expert if he could make a recommendation about stopping the movement of contamination, and you've heard that there was some disagreement, GE and the Illinois EPA said the contamination was contained and wasn't going offsite. The court asked the plaintiff's expert if he could make a recommendation about that, assuming that there was movement. He testified he could rank some options, but he couldn't tell the court which one. So again, you have something different where plaintiffs aren't able to make a recommendation beyond investigation, and the court already found that investigation was sufficiently completed, as did the Illinois EPA. And we've talked a little bit about their proposed order, but in their brief, they did not identify any record evidence to you identifying or supporting a mandatory injunction requiring a physical remediation. The best they did was with their proposed order, which we've talked about. Of course, the proposed order isn't evidence. And as this court explained in Hummel v. St. Joseph County Board of Commissioners, when a federal court addresses a claim for injunctive relief, it must take care to determine whether plaintiffs have offered evidence. I'd like to go back to Apex Oil just for a second. We've talked about what this court did with Apex, but I wanted to point out also that the plaintiff's brief attempted to rely on the district court's order in Apex, and I think that shows another flaw in their argument, that they didn't have to prove anything. The district court in U.S. v. Apex Oil held that the government had presented evidence proving the appropriateness of the requested relief. Again, that didn't occur here. And I'd point out that plaintiff's citation to the Third Circuit's Interfaith Community Organization v. Honeywell does exactly the same. The Interfaith Court explained, quote, the evidence shows that experts presented all other conceivable remedial options known to be potentially available. And on the basis of computer modeling and other factual and scientific grounds, they demonstrated why none were appropriate for the site except excavation. Now, contrast that, it's far different from what we have here. When plaintiff's expert didn't conduct a single test, didn't take a single sample, and effectively conceded that he couldn't even make a recommendation on whether physical remediation was appropriate. Now, as a party seeking mandatory injunctive relief, plaintiffs had the burden to present the evidence they needed to support their case. They didn't do it. Their inability to do so requires affirming that decision. And I think it's worth pointing out that rather than providing you with this evidence, instead, and we did a bit this morning, but plaintiffs used their reply brief to blame the district court and GE for their failures. They essentially contend that they focused on the need for further investigation because that's what GE and the state of Illinois focused on. And they complained that neither GE nor the district court asked their expert about the cleanup and remediation efforts described in their order. But neither the court nor GE had the burden to prove plaintiff's case. That burden fell on them alone. And the district court clearly put them on notice about it. When it granted summary judgment to plaintiff's asked direct reliability, and, Your Honor, this goes to one of your questions earlier, here's what the judge said. The big issue in my head is what would you have me do? And how would it be different than what is in the consent order? So it was plaintiff's burden to submit that evidence. Moreover, they're factually wrong when they attempt to say that GE and the district court didn't address this. Plaintiffs directed the injunction hearing to investigation instead of remediation. At the February 2016 status hearing, before the injunction hearing, the district court asked plaintiffs this question. Do you think there needs to be more investigation before we have an injunction hearing? And if so, what would that investigation be? Plaintiff's counsel responded, we've got to finish the investigation and they've got to start a remedial action plan. But he didn't identify that. He didn't do any investigation between then and the hearing, and he didn't identify a remedial action plan, different than what GE and the Illinois EPA had already done. And this court asked if plaintiff's expert could recommend a remediation plan, and I would just point out again, he testified he could not do so because he needed more information, and he testified that natural attenuation alone could be proper. And he did that sort of in a reverse way, but the recommendation went, is there enough information to recommend natural attenuation? That is correct. So he didn't know if there was or there wasn't. He couldn't guide the court going forward. Then there's been some talk this morning about abstention and whether the district court basically didn't do its job and simply gave in to what the Illinois EPA did with the consent order, and frankly, that is flatly incorrect. Indeed, at the lower level, GE did ask the district court to abstain. We argued that because there was a consent order, it shouldn't conduct this thorough analysis that it did. And what it told us, it said, despite GE's position, the plain language of RCRA gives this court the power to enjoin GE. And then he told the plaintiffs they should use the evidentiary hearing to establish that their requested injunctive relief was necessary and beyond that provided in the consent order. And that's just what this court encouraged district courts to do in Adkins. And it's consistent with the text of RCRA, which says injunctions should issue that are necessary. Your Honor, I think I will stop there unless there are any questions, and we'll rest on our briefs. Apparently not. Thank you. Thank you. Mr. Anaya. Does this start? Oh, maybe that's right. Okay. Your Honor, in a couple of questions that were asked that I have an answer to. You asked what the size of the contamination is at this particular point. Based upon what we know right now from GE's own documents, which we, again, think are incomplete, the size of the contamination is about 1,000 feet long, about 1,500 feet wide, and about 100 feet deep. What GE's counsel adduced from our expert was, doing that calculation based upon those cubic measurements, the 500 million gallons of contaminated groundwater in a public resource, drinking water resource, that will never be used again. We know that there's a half a billion gallons of previously clean drinking water in Whiteside County that can't be used for decades. We also know, to answer your question, that it won't happen tomorrow. It won't happen in a decade. It won't happen in several decades. There was disputed testimony that it might last a century. GE's expert opined that it might be several decades. But RCRA, under the statute that we're here to talk about today, which is not the Illinois EPA statute, we're to talk about RCRA requires a prompt abatement of an imminent and substantial endangerment. Judge Johnston found an imminent substantial endangerment. He found that the state action was not identified as excluded by Congress in 6972-2C. That's where the word abatement is identified. If the state had followed and filed its own RCRA action, which you had the authority to do, or filed and incurred response costs under the Comprehensive Environmental Response Compensation and Liability Act, it's possible that we could have had a legitimate discussion about preclusion of the state action. It did neither. It didn't even have authority under Section 42E, according to the Einolder case that I cited to the court today, to even do anything except tell GE to stop contaminating. GE said fine. What in the injunctive relief are you seeking beyond the current abatement that is going on by GE? What I want in the current order is exactly what we proposed two or three years ago. I want them to fully investigate the property. I want them to do some hot spot relief. Beyond what they've done to date? Yes. North, south, east, and west. And we've identified with painstaking detail those activities. Counsel said a few minutes ago that our expert did not know how to identify a remedy. Certainly he did. You should do a removal. I can't tell you what the precise dimensions and design of that removal is because you did such a crummy job on your investigation. Now, they did a crummy job only in the sense that they did what Illinois EPA asked them to do, show me that the material is contained. Illinois EPA didn't ask them to do an investigation that would be used to abate the material. They didn't even have that authority in 2004. And they didn't file a RCRA case. And they didn't incur costs. Congress told us what to do. Congress said upon the finding of an imminent substantial endangerment, thou shall, district court, order an abatement. And that abatement order is the one that we propose. All right. Thank you, Senator. Thank you, Judge. Thank you.  The case is taken under adjournment.